The first case of the morning called 2-12-1368, People v. Ricardo Jaimes, on behalf of the Affluent, Ms. Leigh Farmer, on behalf of the Leigh and People, Ms. Victoria Simpson. Okay, are both sides ready to proceed? Yes, ma'am. You may proceed when you're ready. Good morning. May it please the Court, Counsel, my name is Leigh Farmer, and today, along with my co-counsel, Amanda Graham, we represent Ricardo Jaimes in this action. Your Honors, this case was supposed to be about whether Ricky knowingly and intentionally participated in the actions leading up to the death of DeMarcus Robinson. Unfortunately, because of the highly prejudicial and inflammatory gang evidence that was used and the otherwise lack of credible evidence putting Ricky at the scene, this case was no longer about whether he was or was not guilty. Instead, the question became, does the jury like guns and gangs or not? While we brief numerous issues below, I intend to focus my time today on the sufficiency of evidence and the gang evidence testimony. Because the two blend together, we may dance in between them. Well, how much evidence of gang involvement does it take before gang involvement becomes relevant? Your Honor, we acknowledge that there are times where gang evidence can and should be introduced against a criminal defendant. We don't view this as a question of the nuances of evidentiary law. Rather, here, there was just a substantial overkill. The state introduced four different witnesses whose sole purpose was to testify to gang-related testimony. Those witnesses, three of the four, testified to incidences from juvenile detention convictions. Three of the four? Yes, Your Honor. One was called to testify regarding Ricky's juvenile detention time when he was approximately... The resource officer. Yes, Your Honor. And that occurred when Ricky was approximately 14 years old. Another witness was called simply to testify of the graffiti drawings in the bathroom of his high school. And then the gang expert who testified additionally testified again about those drawings, which were non-criminal, non-charged drawings with a paint pen in a bathroom. Well, that's still criminal. You say it's not criminal. That's actually criminal damage to state-supported property. It's a crime. Yes, Your Honor. It wasn't criminally charged. It doesn't have to be. Yes, Your Honor. Our point, however, was that it was also not a contested issue. For better or worse, co-counsel acknowledged Ricky's... The co-counsel acknowledged an opening statement. The trial counsel acknowledged an opening statement that he belonged to a gang. Is opening statement evidence? No, Your Honor. The point, however, is that it wasn't a highly contested issue. Therefore, four witnesses to go... But does it matter? I mean, the state can put on whatever evidence it feels is appropriate. Certainly, Your Honor, but the... At what point does this become overkill? I'm sorry. I didn't mean to cut you off. If just one of these four witnesses had been called, Your Honors, my instinct is that we would not be here talking to you about this. In Hamilton, for instance, the court there found that just the testimony of the expert was overkill. It just didn't rise to the level of prejudice. Here, we have four witnesses that were called, and that becomes more relevant because of the otherwise dearth of credible evidence against Ricky. Each act of prejudicial testimony carries more harm when the evidence is closely balanced or not well presented. How old was your client at the time of the shooting? He was 18, Your Honor. And the testimony from the witnesses, including the expert, covered a range of time from approximately when he was about 14 up until about the time of the shooting, correct? Yes, Your Honor. One of the four witnesses was the sheriff's agent that booked him in this particular instance. They were showing that the defendant's gang involvement began at a relatively early age and continued on up until the time of the shooting. That's one way to look at it, correct? That would be one way, Your Honor, but in this instance— You wouldn't argue that way. No, Your Honor. In this instance, because the other evidence presented by the state was so thin, that created almost a cloud in which the jury was constantly bombarded with gang evidence. And we know from the highest court in this state that gang evidence is highly prejudicial. You say the evidence was thin. Your client was identified as the driver, correct? By one witness, Your Honor. Well, he was identified as the driver, correct? Yes, Your Honor. And the shell casing recovered from the vehicle matched the five shell casings that were found at the scene, correct? Yes, Your Honor. They were all fired from the same gun. We know that the ballistics— That was the testimony. The ballistics expert testified that he believed they did come from the same gun. However, he was not able to testify that they matched the bullet. There was no DNA evidence presented or found. At most, all that casing in the car does is put the vehicle there. It absolutely has no bearing on whether or not Ricky was the driver. And an argument could be made—it's not our argument—that it just means that the casing was fired from the same gun in a different incident. It doesn't directly tie it to being fired there. Every witness that testified about the shooting of the gun stated that the shooter got out of the car and fired the gun from out of the car. What you just said is true of every case. The inferences are to be drawn by the finer of fact, not us, correct? Yes, Your Honor. We don't contest that. However, while we know that the testimony of one eyewitness is enough to sustain a criminal conviction, courts require that that testimony be credible. Here, the only witness that put Ricky anywhere near the scene made a total of three different police statements, a recantation, and also— Are you talking about the other victim? William Patrick. Yes, Your Honor. Well, let's talk about the recantations. I mean, recantations are generally unreliable, aren't they? Yes, Your Honor. So isn't that for the trier of fact to weigh and to determine whether or not he was telling the truth then, telling the truth now? What can we do on that? What's our standard of review with respect to recantation witnesses? Certainly, Your Honor, we're not advocating that this court take lightly the trier of fact's opinion. But we do know from established Illinois precedent that if the witness at trial is so unbelievable and so incredible that a reasonable jury should not have found it to be credible, this court is obligated to reverse. And we believe that William Patrick's testimony was just that. Leaving out the recantation because they are a suspect, he made three different police statements in this case, one of which was a mere week before the trial. And at that time, he could no longer identify the shooter. And why did he say that, though? Didn't he indicate he was getting a lot of heat from people? There were a number of implications, Your Honor, including that he was involved in a gang fight while incarcerated with the Sirenios 13, totally unrelated to this case. The testifying witness, William Patrick, was an acknowledged member of the Insane Unknowns and an active gang member. The record was not clear that any of his problems in prison were directly related to this case, only that they were gang related and involved a Sirenios 13 member, which is arguably completely unrelated to his testimony in this case. And moreover, just on the specific incidents to which William made police statements and testified, there are major and material differences in those. In one statement, people were wearing bandanas on their face. That's uncorroborated and contradicted by the other two witnesses to the shooting, both of whom said nothing was covering the face of the heads of either person. In one statement, he threw a brick – in two statements, he threw a brick at the car. That's not in another one of his statements. That's a material fact in this case. In some statements, there was possibly a third person in the back of the car. He denied that at trial. Whether the deceased spoke to the members of the car was contested in and among his statements. His statements, when paired with his trial testimony, contained numerous and material differences, differences that make his testimony highly incredible. What's the difference between presenting all that to a jury and letting the jury sort it out versus us? What level does it have to rise to before we find it to be so unreliable that the conviction cannot stand? The standard, Your Honor, is whether or not someone reasonably could have arrived at this decision, and we contend that they could not have. That the jury arrived at this decision not because of the reliable testimony of the witness, but instead based on the inflammatory and prejudicial gang testimony, along with the other prejudices. We raise in our brief the issue of the dying declaration and also ineffective assistance to counsel. Both of those would be additional prejudices. And here where the only eyewitness to ever put Ricky at the scene made numerous statements, went back and forth as to who he could and couldn't identify, each of those other prejudices took on a higher level of harm. So you're saying she knew it, too? Yes, Your Honor. Under a totality of circumstances here, the actual credible evidence that there is no credible evidence that puts Ricky at the scene. There's contradicted testimony. There's flip-flopping testimony. There's the case in which Justice Burkett mentioned that at most puts his car there. None of those are enough to, beyond a reasonable doubt, assert that Ricky was there. Was there any evidence? Who did the vehicle belong to? It was co-owned by Ricky and his father, Your Honor. And was there any evidence that his father had access to the vehicle that night? It was not discussed in the record. The record is silent. There was no evidence that his father had access to the vehicle. No, Your Honor. It was Ricky and his father co-owned the vehicle. Yes, Your Honor. But even if the vehicle was there, Your Honor, that doesn't put Ricky in the driver's seat. Well, isn't that where the jury comes in to make a reasonable inference based upon the totality of the evidence in the case, the bandana on the face, Horton's testimony, Dangle's testimony, what Patrick observed, the door open, the passenger exit, used two hands, everyone saw them use two hands. They described the gun. He stopped when the brick hit the car, let the guy get out, jump back in. Two witnesses saw his face, the horror, the scare or whatever it looked like on his face. I mean, how are we at the appellate court level who have had not an opportunity to observe these witnesses, to hear them testify, how are we going to second-judge what the jury did? Now, I know you're saying there isn't sufficient evidence, but certainly there was enough evidence for the jury to make a reasonable inference as to guilt or innocence. And you're coming in and asking us, based upon the recantation, based upon the overwhelming evidence with respect to gang testimony, to turn around the Queen Mary, if you will, and send it back, reverse it. Your Honor, our position is that that evidence was not reasonable. Therefore, it's this court's responsibility to reverse. Certainly, we give great deference to the trier fact, but here, cumulatively, we don't believe that it was reasonable. And we don't believe it was reasonable based on the high level of prejudice of the gang testimony, the dying declaration. Let's talk about the dying declaration. You say it was false. Why do you – because Ricky and Richard were interchanged? Your Honor, the testimony and all of the motions in limine, the pretrial proceedings, the statement was always, that damn Richard shot me. Notably, also, the father had been told on numerous occasions by his son, the deceased, that he was having trouble at his high school with a kid named Richard. Richard was believed to be a Latin king. There is evidence in the record that went completely unrefuted that Ricky did not attend the same high school as the victim. So dying declaration – and we know the trial counsel tried to keep the dying declaration out. There's no availability for cross-examination, so of course he would want to. But once it came in, that damn Richard shot me can be explained away. There is no cross-examination in the world that can unring the bell of a sobbing father on the stand, pointing a finger directly at the defendant. That prejudice rises far above what the average cross-examination could be expected to undo. And a motion for mistrial was made. It was not, Your Honor, no. Our position was that it was not made. I think the court could have sua sponte done so. Since that was not done, it was raised in the post-trial motion. And at that point, we do think that it was an abuse of discretion, given the general lack of other credible or corroborated testimony, to not grant that post-trial motion. Again, isn't the trial court in a better position to determine whether or not the motions of the father was such that it would rise to the level of a mistrial? How are we to make that determination? Yes, Your Honor, certainly our point is not specifically about the mistrial not being granted so much as that that was another layer of prejudice. And at the post-trial motion, certainly the trial court did have the opportunity to, at that time, reconsider the whole point of post-trial motions. But we believe that it was absolutely an abuse of discretion, and this bench is perhaps in a better position to see that, not having the interest in not reversing itself. There, the cumulative gang evidence, the dying declaration, those things, at the end of the trial, the trial judge should have been able to see the otherwise lack of evidence presented, the emphasis on inflammatory and somewhat irrelevant gang testimony, the dying declaration altogether, we do believe it was an abuse of discretion at that point, and would say that this bench is in a perfect position to review and make that decision. To our point of the total evidence presented, the State presented no evidence as to the mindset of the driver of the vehicle. We know that accountability law in the State casts a wide net, and it should. It's intended to find or to be able to catch in its net someone who knew that a crime was going to occur, someone that intended for that crime to occur, and someone that helped make that crime occur. The State did not present any evidence that Ricky had any of those mindsets in this case. Again, don't you go, and this is typically the totality of the circumstances in something that the trial court and the trier of fact takes into consideration the five factors with respect to accountability. Isn't that correct? Yes, Your Honor. But again, here our position is that because of the prejudice during the trial, the trier of fact made an unreasonable decision. It's the State's burden to prove each and every element of a crime, and here they failed to prove the mental state. There's no evidence that Ricky intended for this crime to happen. Taylor from the Supreme Court tells us explicitly that simply being at a crime and then driving someone away from it is not enough to show intent to participate. Here, much like Taylor, in Taylor the passenger had a gun and the driver knew. They were in a near collision. The passenger demanded that the driver stop the car. He got out and fired shots. The Supreme Court found that that was not enough to show that the driver intended to be part of a shooting. Here, the car stopped after it was hit by a brick. It was a spontaneous action. The driver got out and shot, or the passenger got out and fired the gun. The State in its presentation argued that knowing that the gun was there, seeing the gun, was enough to make the driver accountable to the shooter. And Taylor says the exact opposite. So then when you have the accountability theory and the factors, three factors to be decided on accountability, are you saying that the jurors could not come to a reasonable inference that two brothers, or two gentlemen in the same car, in the same gang, who are driving along the street, do you think it's unreasonable for the jurors to assume that when he stopped the car dead, left the driver in the back seat out with a passenger out with a scarf over his face, as the evidence showed, and started shooting, that it's unreasonable for the jurors to conclude that the driver knew the intentions of the passenger and knew that the passenger had a gun. That's an unreasonable inference? Your Honor, I have two clarifications on that. One, two of the three eyewitnesses definitively said that nobody had their face covered by a bandana. William Patrick testified that he knew that that meant a shooting was going to go on, but that testimony, the bandana, was directly not corroborated by the other two witnesses. But that's for the jurors to determine whether they felt Mr. Patrick was telling the truth or whether or not the other two women, whose testimony that they gave more weight to. Isn't that correct? Yes, Your Honor, and you said one other thing that I wanted to address, that the two people in the car that the State presented were in the same gang. The State presented zero evidence that Isaac was in a gang. So despite calling this policing of gang territory, two guys in a gang, they presented no evidence that Isaac was in a gang, which again would cut against what the driver knew was going to happen, assuming that it was Ricky and Isaac in a car, and notably Isaac was found not guilty in his severed trial. Assuming, arguendo, that it was Ricky and Isaac in that car, there would be no reason for a driver of a vehicle to believe that a non-gang member was about to participate in gang-related shooting that would rise to accountability. Don't they take into consideration, too, the close affiliation with each other, the flight, the failure to report? First, Your Honor, there was no evidence whether Ricky did or did not report the incident. That was simply not shown. Was there evidence that he reported it? No, there was no evidence that it was. So then can't a reasonable inference be made that he didn't report it, if there was no evidence that he reported it? That would be one inference, Your Honor, yes. And so is that an unreasonable inference for the jury to arrive at? That particular one, no, Your Honor. However, looking at those factors, flight enough, and we know from Taylor, is not sufficient. And these, the two accused, Ricky and Isaac, didn't maintain a close affiliation after Ricky went to care for his young son at the home of his son's mother in Wisconsin and Isaac went home to, or was arrested at his father's home. There was no close affiliation. There was no evidence whatsoever that Isaac was in a gang, which would cut against what Ricky, assuming, again, that he is the one in the car, would have known. For these reasons, we do feel that the State failed to meet its burden in showing accountability. Do Your Honors have any other questions? I do have one question. Would you characterize trial counsel's theory as that defendant just simply wasn't there, he wasn't the driver, don't know how his car got there, but he wasn't there, or is it that the defendant was the driver but did not have any idea what was about to happen? Honestly, I would characterize it as neither, Your Honor. Defense counsel, while promulgating the words misidentification, his actual theory, the theory he put forward, was that Ricky was the shooter, or that Isaac was the shooter, and Isaac had motive. Unfortunately, that's the State's theory. While saying that it was misidentification and he wasn't there, trial counsel appeared to insinuate that he simply wasn't there, but the actual theory, what he actually produced, was that Isaac had motive to shoot, and under that, if you follow it to its logical end, it straight supports the State's theory, which is a lack of effective representation. It meets both problems. There's no reasonable situation in which a trial counsel can solicit testimony that supports the State's theory, and here, attorney trial counsel did. He called a witness that solicited the information not previously produced, that Isaac drove a different type of car, therefore, if he had motive, he wasn't in his own vehicle, and they gave Isaac motive, something the State failed to show. So by calling this witness and soliciting that evidence, Attorney Vila straightforward supported the State's theory of the case and therefore provided an effective assistance of counsel. Any other questions, Your Honor? No, ma'am. Thank you. Good morning, Your Honors. May it please the Court, Counsel, Victoria Joseph representing the people of the State of Illinois. I would like to start with the accountability argument and apologize in realizing as I prepared for this that I did what the Fourth District has recently warned against and conflated the two rules of accountability in finding intent. In accountability, intent can be proved when the defendant either has a shared common criminal intent or a common criminal design, and the cases on which the defendant relies were the shared criminal intent cases, which was tailored, which also cites to Dennis, and this is looking at the underlying crime being a spontaneous act of the principal which was unforeseeable to the drivers in that case, where there was no knowledge whatsoever that there was any crime intending to be committed by the principal. What evidence came in in this trial, Ms. Joseph, that shows that the driver knew and had the same intent as the shooter? Well, as I said in conflating, all of the cases we cited supporting the intent to, the concurrent intent for accountability were cases that were dealing with the common criminal design, and as I said, I apologize that I conflated the two of them together. What evidence came in to show that there was common criminal design between the driver and the shooter? The common criminal design, you don't need to preconceive the plan here. The defendant started the incident by promoting or facilitating the altercation with the rival gang members. When he originally drove by, Patrick and Robinson, he is the one that threw down the gang signs. So he is the one that actually initiated and facilitated that A-crime, the intent to commit A-crime, and that's the difference with the common design principle. It's that it's the commission of A-crime, and any that flow from that crime, you're accountable for. So it's not necessarily the intent to shoot them, but the intent to commit a crime, and as the Fernandez case looks at an older case from our Supreme Court, Tarver, it's looking at this exchanges between the two rival gangs, and here you may not have gone into the neighborhood initially deciding to have an altercation with these two because there's no evidence of that, but there is evidence that you now remain in the neighborhood within a few blocks of the initial throwing down of the gang symbols for I think the testimony ranged from 5 to 20 minutes, that you find the people again, you slow down your vehicle, you allow your passenger to get out who's carrying a rifle, and allow them to shoot them, you remain at the scene until the shooter returns to the car, and then you speed away. So the people submit that that evidence was showing the defendants aiding in the commission. How do you address the recantation that your opponent talks about, the recantation? Well, as your Honor pointed out, recantation testimony is very suspect, and in looking at the recantation, especially in light of the identification evidence, you note that the first identification was the day following the commission of the offense, and at that time there was no evidence that Patrick was under any pressure to identify a person one way or the other. He voluntarily came forward and identified the defendant as the driver. The recantation came under suspicious circumstances where Patrick was picked up on the street by somebody he claimed was a vice lord from Chicago, drove him to defense counsel's office, and at that point the person who picked him up remained with him while he made the recantation. It was within the jury's province to consider the circumstances under which that recantation was made and to weigh that testimony, if it went to the weight of the testimony. So they were able to, the fact that they were under suspicious circumstances and that there was clear evidence that throughout this case Patrick had been threatened on and off, including from his own family, it's a good indication of why Patrick was going back and forth. But his first initial identification, you had the absence of that pressure that was going on. What about counsel's argument that defense counsel was ineffective for introducing evidence that helped the state's case? Your Honor, the people submit that this evidence did not necessarily help the state's case. It really didn't add anything to what was already established. You had three eyewitnesses that put the defendant's vehicle at the scene. You had the casing in the car that matched. A vehicle like the defendant's? A vehicle like, but in addition to finding matching casings in the vehicle and at the scene. It may not have matched the bullet, but the vehicle had been where the gun was fired. And then you had two witnesses put Isaac at the scene. Defense counsel is now presented with these facts. And where you have evidence that's a reasonable inference, the defendant's vehicle is at the scene, and the defendant's brother is at the scene, you now have to decide what to do. And the people submit this. So now this is theory. This is, it was a strategy to take, he spent a lot of time in pretrial trying to get that gang evidence. And here, he not only was trying to move the motive away from the gang testimony by creating a personal vendetta of Isaac in that his car was damaged, leaving the infray. Obviously, the officer, I don't remember if it was an officer or the school resource person who testified that Isaac didn't know who did that to his vehicle. But it could lead to the inference that this was a personal vendetta of retaliation for the damage to his vehicle. Well, let's talk about the gang testimony, Ms. Joseph. Wasn't that a little bit overkill to bring four people in to talk about gang affiliation? Somebody in the county jail, you had a resource officer, you had someone at the detention center, and you had an expert. More particulars while you're thinking. Yes. The detention center. So there's testimony that the defendant was in the detention center. Isn't that highly prejudicial? It may be prejudicial. The people assert that it's not necessarily highly prejudicial. And here it's falling outside of both Montgomery and Illinois rule of evidence 609 as it's unrelated to impeachment. Again, you keep talking about reasonable inferences here. If he's in the detention center, can't you make a reasonable inference he's charged with some crime as a juvenile? The inference can be made. However, in looking at what is controlled under the Juvenile Court Act, it's looking specifically at the evidence that is given during proceedings under the court act and the adjudications themselves. And here you have neither. And the fact that the admissions go to both the defendant's identity as a gang member and the motive in the case. That's all well and good. But the point is here, you have a witness that testifies about the gang affiliation in the context of being booked into a juvenile detention center. Tell me why that was necessary at all to your relevancy argument about introduction of at least some gang evidence. Unlike the fact that you have three other people testifying. Don't you still weigh the probative versus prejudicial? Yes. The context of the detention center. I'm going to separate these two out and then hopefully be able to focus on the detention center. Yes. That in bringing out that admission. You can't. The people could not come up and present a person saying the defendant told me he was in a gang. Under. Do you honestly think defense counsel was going to object and say, excuse me, let's remind the jury that it was when he was being booked in. Having committed a crime. My point is, what's the point of bringing in that kind of evidence? It's highly prejudicial. We have a recent Supreme Court case that cautions us very strongly about using any kind of juvenile adjudication. I think this is precariously close. The trial court heard all these arguments. The trial court did hear all of these arguments. There's no abuse of discretion. There's no abuse of discretion because the judge specifically pointed out the fact that you may not bring the adjudication in. You may not bring the facts of the adjudication in. It was limited to the fact that this is who the person was and this is who they're testifying to. And whether or not counsel was going to object to it or not, the rules of evidence in Illinois require the corroborating circumstances to indicate the trustworthiness of the statement. That is under Illinois Evidentiary Rule 804-2, B-2, in the hearsay sections. When you're doing a statement against interest, you need the corroborating circumstances to clearly indicate the trustworthiness of the statement. I think that's what I was trying to say. You can't just have the person come on and say, he told me this. You're telling the circumstances of why the statement was reliable. It also is – the evidence of admission is going toward more than just counsel in an opening statement saying he was a member of a gang. In proving the people's case, to show the motive, there needed to be the establishment of the gang rivalry and the defendant's own understanding of what that membership meant to be involved in the gang. As far as the two graffiti, that is going toward the understanding of disrespecting rival gangs. The people understand your Honor's concern about the juvenile detention where there was additional evidence being made, but under the abuse of discretion standard, the judge did consider what was being allowed in and limited it to what was relevant in the case. You're looking at the defendant's involvement, what it meant for him to be a member of that gang and his participation and how basically it increased to the point, escalated to this level of involvement of this rivalry that led to the shooting. Should we be influenced at all by the fact that Isaac was acquitted? No, your Honor. Although it's not in the record on this appeal, the circumstances of Isaac's acquittal are distinct from this case. I have looked up some factors in that and obviously it's not in the record before your Honor's. What does the case law say to us about a principal being found not guilty in an accountability case? I do not know, your Honor. The Supreme Court has occasionally commented on that fact. Thank you. Thank you, your Honor. Do you wish to offer a reply? Yes, your Honor. I have just a few brief points, but if I may answer your Honor's last question. That Isaac was found not guilty doesn't change the law of accountability here in Illinois. We know that someone can be found accountable to an unknown or a not guilty principal. However, here, we still think that the state failed to show the necessary mental state, which is a specific intent crime here, to prove him accountable to any principal, let alone this one. You would agree that the law of accountability does not require to show any plan? Correct, your Honor, but it doesn't have to be a pre-set plan. We would absolutely agree with you on that. And the statute is clear. Accountability can be found when, either before or during the commission of the offense, the defendant performs acts that assist the co-defendant, the principal, in committing the offense, correct? Yes, your Honor, but we also know that simply driving away or being present in a scene can't be enough to assist. Those are just factors in addition to that. They are, and our point remains that the state's point that knowing a gun was there and driving him away doesn't meet the necessary standard of accountability. But, absolutely, we agree with that, and that it should. No evidence was presented regarding any conversation? No, your Honor. The other points I had in rebuttal, regarding the recantation, we acknowledge completely that the situation surrounding the recantation was suspect, and that recantations are generally suspect. And our position remains the same if it's completely ignored. The three police statements and the trial testimony were flatly incongruous with each other. There was no way for William Patrick to be telling the truth in each of his police statements and during his trial testimony. And we know from Smith that when the eyewitness is regularly rebutted, the testimony is no longer credible, but it can't sustain a conviction. And secondly, counsel said that the gang testimony went to Ricky's pride in his gang, and I would submit that that's on all four points with Mason, and that in that case they found that this additional evidence going to show pride in gang membership leads to prejudicial weight, not probative weight. And here, all of the gang testimony, while some of it may have been relevant, would run through the gamut of more probative than prejudicial. Four witnesses failed that test. Unless your Honors have any other questions? Wait a minute, four witnesses. How about one or two of them separately? Your Honor, I said in my opening, and I agree, if there had only been one witness called, we would not be making this argument in front of you. And unfortunately that was not the case. Thank you. Thank you, your Honors. All right, thank you both very much. We will be in recess until the next case and a written decision to come into course.